## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## BATESVILLE DIVISION

LISA MURPHY,
ADC #760343                                                      PLAINTIFF

V.                          1:14CV0006 JLH/JTR


DR. JOSEPH HUGHES, ADC Doctor;              DEFENDANTS
and BERNARD WILLIAMS, ADC Supervisor


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

## INSTRUCTIONS

The following Recommended Disposition ("Recommendation") has been sent

to United States District Judge J. Leon Holmes. Any party may file written objections

to this Recommendation. Objections must be specific and include the factual or legal

basis for disagreeing with the Recommendation. An objection to a factual finding

must specifically identify the finding of fact believed to be wrong and describe the

evidence that supports that belief.

An original and one copy of the objections must be received in the office of the

United States District Clerk within fourteen (14) days of this Recommendation. If no

objections are filed, Judge Holmes can adopt this Recommendation without

1

independently reviewing all of the evidence in the record. By not objecting, you may also waive any right to appeal questions of fact.

Mail your objections to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Room A149
Little Rock, AR 72201-3325

## I. Introduction

In this *pro se* § 1983 action, Plaintiff, Lisa Murphy, alleges that Defendants failed to provide her with adequate medical care while she was a prisoner in the McPherson Unit of the Arkansas Department of Corrections ("ADC"). *Doc. 5.*

Defendants have filed a Motion for Summary Judgment arguing that: (1) on each of her inadequate medical care claims, Plaintiff failed to exhaust her administrative remedies before filing this action; and (2) even if Plaintiff had exhausted her administrative remedies, she cannot establish, as a matter of law, that Defendants were deliberately indifferent to her serious medical needs.[1] *Docs. 41, 42,*

---

[1]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c);

*43, & 53.* Plaintiff has filed a Response in opposition to Defendants' Motion for

Summary Judgment. *Doc. 52.* Thus, this issues are joined and ready for disposition.

## II. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that:

"No action shall be brought with respect to prison conditions under section 1983 of

this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are

exhausted." 42 U.S.C. § 1997e(a). The purposes of the exhaustion requirement

include "allowing a prison to address complaints about the program it administers

before being subjected to suit, reducing litigation to the extent complaints are

satisfactorily resolved, and improving litigation that does occur by leading to the

preparation of a useful record."[2] *Jones v. Bock*, 549 U.S. 199, 219 (2007); *see also*

*J.B. ex rel. Bailey v. Avilla R-XIII School Dist.*, 771 F.3d 588, 594 (8th Cir.

2013)(citing *Mathews v. Eldridge*, 424 U.S. 319, 331 n. 11 (1976))(exhaustion

prevents premature interference with agency processes and gives agencies the

_____

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[2] In *Jones*, the Court emphasized that: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211.

opportunity to correct its own errors).

The PLRA requires inmates to: (1) fully and *properly* exhaust their administrative remedies as to each claim in the complaint; and (2) complete the exhaustion process *prior* to filing an action in federal court. In *Jones v. Bock*, 549 U.S. 199, 211 (2007), the Court emphasized that: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Additionally, the Supreme Court has emphasized that: "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218; *see also Woodford*, 548 U.S. 81, 90–91 (2006). Thus, to satisfy the PLRA, a prisoner must fully comply with the specific procedural requirements of the incarcerating facility. *Id.*

To fully and properly exhaust administrative remedies, an ADC prisoner must: (1) file an informal resolution form; (2) file a grievance to the Warden or Health Services Administrator, if the informal resolution attempt is unsuccessful; and (3) appeal the denial of that grievance to the ADC Deputy or the Assistant Director. *See Doc. 43, Ex. A* at 5-14 (ADC Adm. Dir. 10-32 § IV (E) - (G)).

An ADC prisoner cannot raise more than one issue in a grievance. *Doc. 43, Ex.*

4

*A*(ADC Adm. Dir. 10-32 § IV ( D)(2)) ("The Unit Level Grievance form should only address one problem/issue and not multiple problems/issues. . . . Additional problems/issues contained in the grievance will not be considered exhausted.") However, "the PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits." *Hammett v. Cofield,* 681 F.3d 945, 947-48 (8th Cir. 2012).

The ADC exhaustion policy states that "[g]rievances must specifically name each individual involved for a proper investigation and response to be completed by the ADC" and that "[i]nmates who fail to name all parties during the grievance process may have their lawsuit or claim dismissed by the court or commission for failure to exhaust against all parties." *See Doc. 43, Ex. A* (ADC Adm. Dir. 10-32 § IV(C)(4). Finally, the grievance forms themselves remind prisoners that they must specify the "name of personnel involved." *Id.*

### III. Analysis of Whether Plaintiff Properly Exhausted Her Administrative Remedies on Each of Her Inadequate Medical Care Claims

In her Substituted Complaint,[3] Plaintiff makes the following vague allegations of inadequate medical care: (1) Defendant Dr. Joseph Hughes ("Hughes"), the

---

[3] Plaintiff's original Complaint was stricken from the record because her claims did not arise from the same or related occurrences and were not sufficiently related. *Doc. 3.*

5

Medical Director at the McPherson Unit and Plaintiff's treating physician, forced her "to wait 2 ½ years for medical treatment on her: knee, back and neck;" (2) Hughes retaliated against her for filing *this lawsuit* by refusing to give her pain medication for her "bone/pain issues" and by refusing to provide any further treatment for her back and neck problems; and (3) Defendant Bernard Williams ("Williams"), an ADC grievance officer at the McPherson Unit, knew about the allegedly inadequate medical care Hughes provided to Plaintiff, but did not take corrective action.[4] *Doc.* 5.

In Defendants' Motion for Summary Judgment, they argue that Plaintiff failed to exhaust her administrative remedies with regard to each of these three claims.[5]

_____

[4] Williams did *not* personally provide any medical care to Plaintiff. Instead, he reviewed several grievances Plaintiff filed about the medical care she received from Hughes.

[5] Defendants properly raised exhaustion as an affirmative defense in their Answer. *Doc. 26 at 1.* However, because they filed this Motion for Summary Judgment on November 24, 2014, well after the July 10, 2014 deadline set by the Court for filing motions on the issues of exhaustion, Plaintiff argues that Defendants have waived their right to assert failure to exhaust administrative remedies. *See Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2008)(An inmate's failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant.)

Defendants admit they filed their Motion for Summary Judgment on the exhaustion issue beyond the July 10, 2014 deadline but emphasize that they properly raised the affirmative defense of failure to exhaust in their Answer. *Doc. 26.* Importantly, since the time Defendants filed their Answer on May 5, 2014, Plaintiff has been on notice that they intended to raise her failure to exhaust as an affirmative

6

*Doc. 41.*

The parties agree that Plaintiff fully exhausted seven grievances complaining about the medical care she received while incarcerated in the McPherson Unit: MCP 12-00022; MCP 11-00119; MCP 11-00104; MCP12-00787; MCP 12-01091; MCP 12-01090; and MCP 12-1089. Defendants argue that *none* of these fully exhausted grievances address *any* of the three claims raised in Plaintiff's Substituted Complaint.[6] *Doc. 43, Ex. A.* To determine if any of those seven grievances are

---

defense. Likewise, she has been given time to file her Response to Defendants' Motion for Summary Judgment and present her argument and evidence in support of exhaustion. Defendants delay in filing their Motion for Summary Judgment has in no way prejudiced Plaintiff. Accordingly, the Court concludes that Plaintiff's argument that Defendants have waived the affirmative defense of exhaustion is without merit.

[6]Plaintiff attached four additional grievances (MCP12-00786, MCP 12-00939,MCP 13-275, and MCP 12-00896) to her initial Complaint which was stricken from the record. *Doc. 2.* Plaintiff did not attach any of those four grievances to her Substituted Complaint or to her Response to Defendants' Motion for Summary Judgment. *Docs. 5 & 51.*

During the administrative review process, MCP12-00786 and MCP 12-00939 were rejected, on their face, with a stamp stating "failure to follow policy has resulted in a rejection for this appeal and marks the end of the appeal process." *Doc. 2.*

In MCP 13-275, Plaintiff stated that she had a medical restriction to not bend down on her left knee and this restriction was disregarded twice by Sergeant Bacon and Corporal Phipps. *Doc. 2.* In Grievance MCP 12-00896, Plaintiff complained that she was made to stoop down on her knees to be shackled and that "Warden Faust is allowing me to be physically assaulted/abused." *Doc. 2.* None of the matters giving rise to grievances MCP 13-275 and MCP 12-00896 are related to the three claims raised by Plaintiff in this lawsuit, and none of the individuals identified by Plaintiff in those two grievances are parties to this action. Accordingly, none of those four grievances are relevant to whether Plaintiff properly exhausted her administrative

relevant to the claims Plaintiff is asserting against Hughes and Williams, *in this case*, the Court must analyze each grievance separately.

In grievance MCP 12-00022 , Plaintiff alleges that she alerted medical staff to her need to be seen by an OBGYN to address a football size mass that was found on her uterus. *Doc. 43, Ex. A*. Plaintiff does *not* name either Hughes or Williams in this grievance. Furthermore, in this grievance, Plaintiff does not assert any of the claims raised in her Substituted Complaint. Accordingly, this grievance is not relevant to the issue of whether Plaintiff properly exhausted any of the three claims she is asserting in her Substituted Complaint.

In grievance MCP 11-00119, Plaintiff alleges that, on January 24, 2011, she fell and *unspecified* medical staff refused to provide her with care for a hurt shoulder and a bone that was "sticking out of [her] right side." *Doc. 43, Ex. A*. Because Plaintiff did *not* name either Hughes or Williams in this grievance, ADC officials could not have reached the merits of *any claims* Plaintiff might have been attempting to assert against them.

Additionally, in her Substituted Complaint, Plaintiff mentions nothing about receiving inadequate medical care for a shoulder injury. While she does alleged that Hughes refused to give her pain medication for "bone/pain issues," she makes it clear

---

remedies in connection with the claims she is asserting in this action.

8

his alleged misconduct *was in retaliation for filing this lawsuit*. Plaintiff initiated this action on January 13, 2014, which means the retaliation claim did not arise until *after* that date. This rules out any possibility that matters related to the health care she received for her fall on January 24, 2011, are relevant to the claims she is asserting in this action. Accordingly, grievance MCP 11-00119 is not relevant to the issue of whether Plaintiff properly exhausted any of the three claims she is asserting in her Substituted Complaint.

In grievance MCP 11-00104, Plaintiff alleges that: (1) she had "left side pain and a swollen tube like tumer [sic];" (2) an x-ray later showed she was constipated; and (3) Hughes prescribed laxatives to relieve Plaintiff's constipation. Because Plaintiff believes the laxatives caused her tumor to increase in size, she alleges in this grievance that she needs some other form of treatment. *Doc. 43, Ex. A.*

While Hughes is named in this grievance, his allegedly improper medical treatment of her "tumor" has nothing to do with either of the claims she has asserted against him in her Substituted Complaint: he forced her "to wait 2 ½ years for medical treatment for her knee, back, and neck;" and he refused to give her medication for her "bone/pain issues" in retaliation for her filing *this lawsuit*. As to Williams, this grievance never mentions him by name or attempts to assert any claim against him.

Accordingly, grievance MCP 11-00104 is not relevant to the issue of whether Plaintiff properly exhausted any of the three claims she is asserting in her Substituted Complaint.

In grievance MCP12-00787, Plaintiff alleges that she has heart blockage, constant chest pain and shortness of breath and "if something is not done within a week, I'm filing suit on Hughes and APN Hutton." *Docs. 2 & 43, Ex. A.* Deputy Director Wendy Kelley ("Kelley"), in her administrative ruling, found that Plaintiff was seen by Hughes for heart blockage and the issue "is being addressed." *Doc. 2.* Plaintiff did not name Williams in this grievance.

Accordingly, grievance MCP12-00787 is not relevant to the issue of whether Plaintiff properly exhausted any of the three claims she is asserting in her Substituted Complaint, none of which involve heart blockage, chest pain, or shortness of breath.

In grievance MCP 12-01091, Plaintiff alleges that she needs her milk of magnesium reordered. *Docs. 2 & 43, Ex. A.* Kelley, in her administrative ruling, found that the issue was resolved because Plaintiff received her requested medication. *Doc. 2.* To the extent that this grievance does not raise any of the claims Plaintiff is asserting in her Substituted Complaint, it is irrelevant to the issue of exhaustion in this lawsuit.

In grievance MCP 12-01090, filed on October 13, 2012, Plaintiff alleges that

she went to the infirmary for chest pains and started throwing up. She states that: (1) she saw Hughes the next day and informed him of her nausea; and (2) Hughes refused to do anything for this problem, other than order laxatives and x-rays. Plaintiff states that, because she had filed an earlier lawsuit against Corizon and its medical staff, Hughes is treating her differently. Plaintiff further states that, "Ms. [sic] Williams knew about this."

After this grievance was denied, Plaintiff appealed. Kelley found grievance MCP 12-01090 to be without merit because Plaintiff was seen for her complaints by Hughes, who exercised his medical judgment regarding the treatment she received for her medical problems. *Doc. 2.*

Importantly, grievance MCP 12-01090 only alerts ADC officials that Plaintiff believed, *in October of 2012*, that Hughes was "treating her differently," *i.e.* retaliating against her because of her *previously filed lawsuits*.[7] Thus, this cannot be the same retaliation claim Plaintiff is asserting in her Substituted Complaint, where she alleges that Hughes was retaliating against her because she filed *this lawsuit,* on January 13, 2014, over a year *after* the allegedly retaliatory conduct by Hughes in October of 2012. Accordingly, grievance MCP 12-01090 is not relevant to the issue

---

[7] Prior to filing this action on January 13, 2014, Plaintiff filed at least 24 lawsuits about the conditions of her confinement. It is impossible to tell which of those actions Plaintiff is referring to in grievance MCP 12-01090.

of whether Plaintiff properly exhausted any of the three claims she is asserting in her Substituted Complaint.

In grievance MCP12-01089, filed on October 13, 2012, Plaintiff alleges that she has had issues with her heart, stomach, colon, female problems, and "bone (DDD) disease"[8] and that for approximately 23 months she had "begged" Hughes and Williams "for help -- all to no avail." *Docs. 2 & 43, Ex. A*. The Health Services Response does not address Plaintiff's complaint about the treatment she received for her degenerative disk disease. Instead, it characterizes her complaint as follows: "You feel that medical staff is not properly addressing your complaints of heart, stomach, *bone* and female problems." *Doc. 43, Ex. A*.

In her administrative appeal of the denial of this grievance, Plaintiff only states that: "I've been neglected so long - I vomiting [sic] stool. Someone has to help before its to [sic] late." On January 4, 2013, Kelley affirmed the denial of the grievance. *Docs. 2 & 23, Ex. A*. In doing so, Kelley acknowledged that, in grievance MCP 12-01089, Plaintiff had raised complaints about the medical treatment she was receiving for problems with her "heart, stomach, colon, female parts, and *bones.*" However, rather than specifically addressing each of those five broad medical concerns, Kelley

---

[8]Defendants acknowledge that in their Brief in Support of Motion for Summary Judgment that Plaintiff's reference to "DDD" stands for degenerative disk disease. *Doc. 42.*

12

noted that, since Plaintiff's November 21, 2012 intake examination, she had been examined by medical providers seventeen times, received numerous x-rays and lab tests, and been prescribed numerous medications. Based on the totality of that extensive medical treatment, Kelley concluded that Plaintiff had received "appropriate care" for her various "complaints."

It is a close call on whether grievance MCP 12-01090 can be broadly construed to have properly exhausted the vague allegations in Plaintiff's Substituted Complaint that Hughes provided inadequate medical care for *unspecified knee, back, and neck problems,* and that Williams failed to correct that matter. At a minimum, this grievance alerted ADC officials to her belief that Hughes was providing her with inadequate medical care for a variety of health problems, including degenerative disc disease, and that Williams failed to take corrective action about those matters. Instead of rejecting that grievance, because it sought to complain globally about a host of medical issues, prison officials elected to address the merits of Plaintiff's concerns, *in equally vague language*, and concluded that the unspecified medical care she received, between her November 21, 2012 intake examination and January 4, 2013, was appropriate and did not need to be corrected.

Erring on the side of caution and liberally construing grievance MCP12-01090, the Court concludes that she properly exhausted her administrative remedies on her

claims that: (1) Hughes provided her with inadequate medical care for degenerative disc disease in her knee, back, and neck; and (2) Williams failed to take corrective action after reviewing her grievances about those specific medical problems. However, Plaintiff's retaliation claim against Hughes should be dismissed, without prejudice, because she failed to properly exhaust that claim.

## IV.  Defendants, As a Matter of Law, Are Entitled to Summary Judgement on Plaintiff's Remaining Inadequate Medical Care Claim

### A.    Undisputed Facts

The facts surrounding the medical care Plaintiff received for her problems with her knee, back, and neck are undisputed. These facts are as follows:

1.   Plaintiff first went to the infirmary for neck and back pain on February 6, 2012. She was given ibuprofen for pain and instructed to do strengthening exercises. *Doc. 43, Ex. B at 1.*

2.   Plaintiff was seen on February 13, 2012, for back and neck pain. It was noted that Plaintiff had no muscle spasms, redness, warmth or swelling and that she could easily bend and touch her toes.  Plaintiff was instructed to take her ibuprofen. *Doc. 43, Ex. B at 1.*

3.   Plaintiff was seen on August 14, 2012, for neck, back and knee pain. Plaintiff was instructed to take ibuprofen and Tylenol for pain and educated on

14

applying warm compresses to a painful area. Plaintiff was also instructed to fill out a sick call slip if her problems persisted or worsened. *Doc. 43, Ex. B at 1-2.*

4.    On August 21, 2012, Hughes ordered a restriction that excepted her from bending down on her left knee. Hughes based this restriction on a 2011 MRI that indicated she had a torn ACL. Hughes noted that the typical treatment for a torn ACL is to continuously monitor range of motion, prescribe physical therapy exercises and non-steroidal ant-inflammatory drugs (NSAIDs), and evaluate subjective complaints of pain. Finally, he noted that surgery would only be appropriate where a patient has a torn ACL *and* there is torn cartilage in the knee.  *Doc. 43, Ex. B at 2.*

5.    On October 12, 2012, Hughes saw Plaintiff for a follow up appointment and conducted Drawers and McMurrays tests to evaluate her range of motion; determine if her ACL was torn; and determine if her cartilage was intact. Hughes found Plaintiff had a torn ACL but her cartilage was intact. He ordered a left knee brace for Plaintiff and scheduled a follow up appointment. *Doc. 43, Ex. B at 2.*

6.    On January 23, 2013, Hughes saw Plaintiff for her follow up appointment. He increased her prescription for a NSAID, prescribed acetaminophen, and ordered an x-ray of her left knee due to continued pain. The x-ray showed a normal examination. *Doc. 43, Ex. B at 3.*

7.    Hughes saw Plaintiff on March 13, 2013, for knee and back pain. He

noted that her back was tender in the lumbar area and her left knee showed no effusion, collaterals intact, Drawers slightly laxed on the left, and McMurrays appeared positive on the left. He noted he would continue to monitor her condition. *Doc. 43, Ex. B at 3.*

8.    Hughes saw Plaintiff on July 19, 2013, for knee pain. He referred Plaintiff to Dr. Schock for evaluative surgery and prescribed her Neurontin 100 milligrams, three times daily, for pain relief. *Doc. 43, Ex. B at 3.*

9.    On August 6, 2013, Plaintiff had an orthopedic consult with Dr. Schock, who determined her cartilage was not torn. He prescribed gabapentin, 600 mililgrams, three times daily as needed, and alpha lipoic acid. He instructed Plaintiff to continue wearing her knee brace and instructed her on some exercises. *Doc. 43, Ex. B at 3-4.*

10.    Plaintiff was seen in sick call on August 12, 2013, and August 14, 2013, for back and neck pain. She was already on pain medication and was referred for a follow up with Hughes. *Doc. 43, Ex. B at 4.*

11.    On August 20, 2013, Hughes saw Plaintiff for complaints of back pain. He noted that her back was tender in the lumbar area and left sacroiliac joint. He also noted that, based on his review of an MRI on her back from three years ago, she had degenerative disk disease at L4 and L5, with a bulging disc herniation at L4-L5 which protruded into the right lateral foramanial space. Hughes ordered an x-ray and again

16

referred her to Dr. Schock. *Doc. 43, Ex. B at 4.*

12.     On August 24, 2013, Plaintiff had two x-rays of her cervical and lumbar spine. The cervical spine x-ray showed arthritis with a degenerative narrowed disc, but an otherwise unremarkable study. The lumbar spine x-ray showed a narrowed disc, with a slight curvature of the lumbar spine, but no fractures. Hughes noted that the arthritis in Plaintiff's back needed to be treated with NSAIDs, which she was already taking for her knees. Hughes concluded there was nothing else to be done. *Doc. 43, Ex. B at 4.*

13.     Dr. Schock saw Plaintiff on October 1, 2013. He noted that she had lower back pain, with mild left sciatica, post arthrosis L4-S1, and mild listhesis L4-L5. After noting that she was taking gabepentin, Indocin, a lipoic and Tylenol, he prescribed a muscle relaxant. *Doc. 43, Ex. B at 4.*

14.     On October 16, 2013, Hughes saw Plaintiff for a follow up regarding knee pain. He noted some slight swelling, but the Drawers and McMurrays tests were negative. Hughes aspirated her knee, prescribed a steroid injection of the left knee and ordered a wheelchair for Plaintiff. *Doc. 43, Ex. B at 5.*

15.     On October 23, 2013, Plaintiff had an x-ray of her left knee. The results showed a normal examination. *Doc. 43, Ex. B at 5.*

16.     Hughes saw Plaintiff on October 24, 2013, for possible knee injections.

17

He did not find knee injections necessary. However, since she did have internal derangement of the left knee, he again referred her to Dr. Schock. *Doc. 43, Ex. B at 5.*

17.     On November 5, 2013, Plaintiff fell and injured her knee. She had no swelling in her left knee and no other sign of injury but she was unable to walk on her own. A cold compress was applied, her left knee was wrapped in an ace bandage, she was provided with crutches, and a knee brace was ordered. Later that day, Dr. Schock saw Plaintiff. He ordered a two strap knee brace, instructed her to continue with her exercises and current medications and issued her a restricted duty and knee brace script. *Doc. 43, Ex. B at 5.*

18.     On November 8, 2013, Plaintiff was seen in the infirmary for left knee pain. She had crutches and no sign of acute distress was noted, although there was swelling. A no duty script was prescribed, as well as crutches and an ace wrap for her left knee. *Doc. 43, Ex. B at 6.*

19.     On November 12, 2013, Plaintiff was seen by medical staff after she slipped and twisted her knee. She was given acetaminophen, a no duty script, educated to elevate her leg above heart level, an x-ray was ordered, and an ace wrap and wheelchair were prescribed. *Doc. 43, Ex. B at 6.*

20.     On November 21, 2013, Hughes saw Plaintiff and noted her left knee was

18

positive for Drawers and McMurrays. He prescribed her acetaminophen, a left knee brace, a walker, no duty scripts and ordered an MRI of her left knee. She had the MRI on December 31, 2014. *Doc. 43, Ex. B at 6.*

21.   On January 2, 2014, Hughes saw Plaintiff regarding an allergic reaction to her medications.  Hughes noted he did not feel it was medically necessary for her to have a wheelchair or walker.  He stated that Plaintiff needed to ambulate and do the extension exercises. He instructed her to wear a knee brace. *Doc. 43, Ex. B at 6.*

22.   Hughes saw Plaintiff on January 9, 2014, for a follow up on her MRI.  He noted the Drawers and McMurrays tests were positive, which caused him to suspect a torn medical menisucs, in addition to the torn ACL. He referred her to a specialist for an orthopedic evaluation. *Doc. 43, Ex. B at 6-7.*

23.   In his affidavit, Hughes states that he chose conservative treatment for Plaintiff and that this was appropriate medial care and treatment for her knee, back and neck pain. *Doc. 43, Ex. B at 7.*

24.   Defendants also submitted an Affidavit from Dr. Robert Floss, Associate Regional Medical Director of Correct Care Solutions. *Doc. 43, Ex. C at 1.* Dr. Floss stated that he reviewed Plaintiff's medical records with respect to her complaints of knee, back, and neck pain and found that,

[I]t   is   apparent   that   [Plaintiff]   was   provided   with   appropriate

conservative treatment for her complaints.   In this case, alternative treatment was recommended which included medication and other assistive devices, including an assortment of knee wraps and braces, crutches, a walker and a wheelchair. In my opinion, [Plaintiff] could have utilized any of the above for her back, neck and knee complaints. Further, [Plaintiff] also had appropriate pain management during this period of time to include ibuprofen, Neutontin, Indocin, and Tylenol.

*Doc. 43, Ex. C at 1.*

## B.   Analysis of Plaintiff's  Inadequate Medical Care and Corrective Inaction Claims forProblems with her Knee, Back, and Neck

To prevail on an Eighth Amendment inadequate medical care claim, Plaintiff must prove that: (1) she had objectively serious medical needs; and (2) Defendants subjectively knew of, but deliberately disregarded, those serious needs. *See Estelle v. Gamble,* 429 U.S. 97 (1976); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). Deliberate indifference, which is a higher standard than gross negligence, "requires proof of a reckless disregard of the known risk." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001). In other words, "there must be actual knowledge of the risk of harm, followed by deliberate inaction amounting to callousness." *Bryant v. Endell*, 141 F.3d 1290, 1291 (8th Cir. 1998). Negligence, gross negligence, or a mere disagreement with the treatment decisions does not rise to the level of a constitutional violation. *Langford*, 614 F.3d at 460; *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). "In the face of medical records indicating that treatment was provided and

physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010); *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007). Instead, the prisoner must present *evidence* demonstrating that the "course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference in violation of [the] Eighth Amendment right to be free from cruel and unusual punishment." *Dunlany,* 132 F.3d at 1243.

The undisputed facts, including  medical records and the affidavits from Hughes and Dr. Floss,  show that Plaintiff was regularly seen by Hughes and other medical staff for knee, back, and neck issues. Plaintiff's own medical records completely undermine the assertion in her Substituted Complaint that she was made to wait 2 ½ years for treatment on her knee, back, and neck, or that she was forced to suffer with pain and walk on a "broke back" for 2 ½ years. *Docs. 5 & 52.* Rather, theses medical records establish that Plaintiff was promptly and repeatedly seen by medical personnel for problems with her knee, back and neck. She was seen no less than twenty-two times, from February 6, 2012, to January 9, 2014, for complaints about her knee, back, and neck. During this time, Plaintiff was prescribed various medications, including NSAIDs, acetominophen, ibprofen, Neurontin, a muscle

relaxant, and steroid injections. Furthermore, Hughes instructed her on exercises, ordered no bending restrictions, provided her with knee braces, crutches, and a wheelchair. He regularly performed tests on her knee,  had her knee x-rayed several times,  ordered an MRI on her knee, and repeatedly  referred her to an orthodpedic specialist.

Nothing in the record suggests that Plaintiff's medical needs were disregarded. *See Logan v. Clarke*, 119 F.3d 647, 649-50 (8th Cir. 1997)(finding no deliberate indifference when medical providers treated the inmate on "numerous occasions" and "made efforts to cure the problem in a reasonable and sensible manner"). Furthermore, Dr. Floss's affidavit established that Hughes' care and treatment of Plaintiff was "appropriate conservative treatment for her complaints." Plaintiff may not agree with Hughes' choice to adopt a conservative approach to her treatment, but she has not come forward with any evidence to refute the facts in the Affidavits of Hughes and Dr. Floss, or to demonstrate in any way that she received inadequate medical care for the problems with her knee, back, and neck. *See Langford*, 614 F.3d at 460 (holding that a prisoner's disagreement with a medical provider's treatment decisions does not rise to the level of a constitutional violation).

Accordingly, Hughes is entitled to summary judgment and Plaintiff's inadequate medical care claim against him should be dismissed, with prejudice. In

light of that conclusion, Plaintiff's corrective inaction claim against Williams also fails, as a matter of law, and should be dismissed, with prejudice. *See Parrish v. Ball,* 594 F.3d 99, 1002 (8th Cir. 2010) (explaining that, to prevail on a corrective inaction claim, a prisoner must establish that the defendants were aware that his constitutional rights were being violated, but failed to take corrective action)*; Sims v. Lay*, Case No. 05-2136, 2007 WL 328769 (8th Cir. Feb. 2, 2007) (unpublished decision) (holding that a supervisory liability claim fails, as a matter of law, when there has been no underlying constitutional violation).

## IV. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' Motion for Summary Judgment (Doc. 41) be GRANTED.

2.    Plaintiff's claim that Hughes provided her with inadequate medical care for degenerative disc disease in her knee, back, and neck be DISMISSED, WITH PREJUDICE.

3.    Plaintiff's claim that Williams failed to take corrective action after reviewing her grievances about the medical care she received for degenerative disc disease in her knee, back, and neck be DISMISSED, WITH PREJUDICE.

4.    All other claims raised in her Substituted Complaint be DISMISSED, WITHOUT PREJUDICE.

5.      The Court CERTIFY, pursuant to 28 U.S.C. § 1915(a)(3), that an *in forma pauperis* appeal from any Order adopting this Recommended Disposition would not be taken in good faith.

Dated this 8th day of April, 2015.

_____

UNITED STATES MAGISTRATE JUDGE